UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | |
|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY,** | **CIVIL ACTION NO. 5:18-207-KKC** |
| **Plaintiff,** | |
| **v.** | **ORDER AND OPINION** |
| **KEVIN TOBERGTE and ANDY HALL,** | |
| **Defendants.** | |

**\*\*\* \*\*\* \*\*\***

This matter is before the Court on Plaintiff Norfolk Southern Railway Company's motion for partial summary judgment (DE 78) and Plaintiff's motion for leave to file a first amended complaint (DE 103). For the following reasons, both motions are granted in part and denied in part.

I. **Background**

A. **The Collision**

On March 18, 2018, Plaintiff Norfolk Southern Railway Company's southbound train 175 ("Train 175") collided with its northbound train M74 ("Train M74") in Georgetown, Kentucky, destroying two of Plaintiff's locomotives, causing extensive damage to other locomotives, and derailing nearby rail cars. (DE 1 ¶¶ 6-14.) Defendant Kevin Tobergte was the locomotive engineer on Train 175, and Defendant Andrew Hall was Train 175's conductor. (DE 1 ¶¶ 7-8.) Plaintiff contends that as Train 175 approached at Georgetown, the automatic signal at that location displayed an "APPROACH" indication. (DE 1 ¶ 10.) Such an indication required Defendants to stop before the next signal, which was a "STOP" signal at

Akers, Kentucky.  (DE 1 ¶ 10.)  According to Plaintiff, Defendants failed to reduce the train's speed, failed to stop the train, and consequently, caused the collision.  (DE 1 ¶¶ 11-14.)

## B.      Plaintiff's Training of Defendant Tobergte

Plaintiff maintained a written program for certifying its locomotive engineers, and the Federal Railroad Administration ("FRA") approved this plan.  Noakes Decl. ¶ 3.  Under its certification program, Plaintiff designated Rodney Noakes as a Designated Supervisor of Locomotive Engineers to evaluate trainees, including Defendant Tobergte.  *Id.* ¶¶ 7, 10. Noakes determined that Tobergte met all of the qualifications for certification as a locomotive engineer.  *Id.* ¶ 11.  However, in Defendant Tobergte's affidavit, he states that two trainers, Paul Martin and Lee Jenson, told him that they did not think he was making sufficient progress to be promoted to a locomotive engineer.  (DE 90-1, Tobergte Aff. ¶ 8.)  Nonetheless, Defendant Tobergte was certified, and Noakes continued to evaluate Defendant Tobergte after his certification.  Noakes Decl. ¶ 15.

Plaintiff also had a written program for instructing employees on the meaning and application of its operating rules.  *Id.* ¶ 5.  Plaintiff filed its operating rules with the FRA. *Id.* ¶ 5.  Noakes supervised Defendant Tobergte's instruction and testing on Plaintiff's operating rules and conducted in-person evaluations of Defendant Tobergte's performance in operating trains.  *Id.* ¶ 8.  Plaintiff also retained annual summaries of its operational tests and inspections of engineer trainees, and made these copies available to the FRA for review. *Id.* ¶ 9.

## C.      The Implementation of Plaintiff's Positive Train Control System

Under the Rail Safety Improvement Act of 2008 ("RSIA"), certain railroad carriers must implement a positive train control system for operations conducted on specific railroad lines.  49 U.S.C. § 20157(a)(1).  A positive train control ("PTC") system is "a system designed to prevent train-to-train collisions, over-speed derailments, incursions into established work

zone limits, and the movement of a train through a switch left in the wrong position." 49 U.S.C. § 20157(i)(5). Depending on the circumstance, railroad carriers may institute a PTC Implementation Plan ("PTCIP") that provides for "specific goals for progressive implementation of onboard systems and deployment of PTC-equipped locomotives." 49 C.F.R. § 236.1006(a)-(b).

Plaintiff's PTCIP provided for the progressive implementation of Plaintiff's PTC system by December 31, 2020, and outlined Plaintiff's implementation schedule. Wilson Decl. ¶ 8. The PTCIP also reported Plaintiff's progress in reaching annual implementation milestones. *Id.* At the time of the collision, the PTCIP only required that 10%-25% of Plaintiff's trains that operated on PTC lines have PTC apparatuses. *Id.* ¶ 11; Wilson Decl., Ex. 1 at 18. The FRA approved this plan. Wilson Decl. ¶ 8. Following the collision, Plaintiff submitted a revised PTCIP that noted that "not all trains operating over these districts or subdivisions . . . will necessarily be controlled by a locomotive with a fully operative and functioning PTC apparatus in accordance with an approved PTC Safety Plan, as otherwise required by [the applicable regulations], until the PTC system is fully implemented." *Id.* ¶ 13; Wilson Decl., Ex. 4 at 675. The FRA also approved the revised PTCIP and concluded that Plaintiff had installed all the necessary PTC system hardware for PTC system implementation under the PTCIP. Wilson Decl. ¶ 14; Wilson Decl., Ex. 5 at 680-81.

In the months prior to the incident, Plaintiff published bulletins regarding its PTC system. (*See* DE 90-3; DE 93-6.) On January 1, 2018, Plaintiff issued a bulletin declaring, "Effective November 29, 2017, only Trains 142, 143, 175, and 180, will be operated with the PTC system active" on the tracks where the collision later occurred. (*See* DE 90-3 at 2.) On February 20, 2018, Plaintiff released another bulletin, which stated that "all trains operating . . . on the [tracks where the collision later occurred] that are equipped with a Positive Train

Control (PTC) locomotive in the lead position must operate with the PTC system active and in accordance with the PTC rules and bulletined instructions."  (DE 93-6 at 1.)

On the date of the collision, Train 175's lead locomotive did not have a PTC apparatus. Tobergte Dep. at 33:14-17.

**D.     Unit 4063's Brake Issues**

The locomotive directly behind Train 175's lead locomotive was Unit 4063.  *See* Stege Dep. at 22:12-17.  Ryan Stege, Plaintiff's Director of Locomotive Maintenance, testified at his deposition that while Unit 4063 had a working PTC system, the locomotive had dynamic brake issues due to system malfunctions.  *Id.* at 4:24, 34:1-10.  Because of this brake trouble, Unit 4063 was not placed in the lead.  *Id.* at 34:1-5.  Although the Unit had experienced dynamic brake issues in the past, the issues present on the day of the collision had only arisen a few days prior to the incident.  *Id.* at 34:13-17.  Unit 4063 also underwent repairs for dynamic brake issues during the time between when the issues first arose in February and the date of the collision.  *Id.* at 34:15-35:4.  However, the Unit had additional issues subsequent to those repairs.  *Id.* at 35:2-4.

**E.     Train 175's Dispatch and Signal Systems**

Typically, when a train violates a "STOP" signal, Plaintiff's dispatch system depicts a pop-up alert on display screens, and an alarm sounds.  Haines Decl. ¶ 11; Wenger Dep. at 34:14-35:7.  But if two trains enter the same block of track from opposite directions, the dispatch system assumes that the train that is authorized to enter the block is the train that actually entered the block.  Haines Decl. ¶ 11.  In that case, the dispatch system does not issue a pop-up alert or an alarm.  *Id.*  According to Ronald Haines, who acted as Plaintiff's Assistant Superintendent of Dispatch on the day of the incident, this is a limitation of the system, not a malfunction.  *Id.* ¶¶ 1-2, 11.

4

Playback from and recordings of the dispatch system showed Train 175 entering the block of track at Akers from the north, while Train M74 entered the track at Akers from the south. *Id.* ¶¶ 12-13. Train M74 had a green signal that authorized it to enter that block of track. *Id.* ¶ 13. When Train 175 violated the Akers "STOP" signal, the dispatch system assumed that Train M74 entered the block of track instead, and the display screen showed that Train M74 entered the block rather than Train 175. *Id.* ¶15. Therefore, the dispatch system did not display a pop-up alert or sound an alarm. *Id.* ¶ 23; Wenger Dep. at 35:13-20, 36:10-14.

Joshua Wenger, the dispatcher on duty when the collision occurred, testified in his deposition that because he did not receive a pop-up alert or an alarm signal, he did not know that Train 175 violated the Akers "STOP" signal. Wenger Dep. at 4:12-17, 37:22-38:6. If he had received the alert or the signal, he would have contacted Train 175, and if he was unable to contact Train 175, he would have contacted trains in the surrounding area. *Id.* at 36:16-37:6.

Daniel Gold, Plaintiff's Assistant Division Manager for Communications and Signals at the time of the collision, contends that the signal systems for both northbound and southbound traffic were "functioning properly" in the hour before the incident. Gold Decl. ¶¶ 1-2, 12. Haines maintains that on the day of the collision, Plaintiff's dispatch system was operating as designed and in compliance with Plaintiff's operating rules. Haines Decl. ¶ 26. For his part, Wenger does not know whether the display board malfunctioned, but he was "not aware of any malfunctions." Wenger Dep. at 72:11-12.

## F.     The Response of Train M74's Crew

As Train M74 approached the signal at Akers, the signal appeared red, indicating that the train should stop. Lloyd Dep. at 76:4-14; Mason Dep. at 34:12-17. In encountering such signals, Plaintiff's Operating Rule 287 requires the train to "[s]top as soon as possible without

endangering the movement of the train."  Lloyd Dep. at 88:11-23; Mason Dep. at 36:19-20. Under Plaintiff's Operating Rule 273, if a train approaches a fixed signal that requires a stop, the train "must stop before any part of the equipment passes the signal," depending on the circumstance.  Mason Dep. at 35:25-36:13.  Train M74's crew placed the train in "emergency" twelve seconds before impact, but the brakes were applied twenty-four seconds before impact. Lloyd Dep. at 89:5-20.

**G.      Plaintiff's Motion for Partial Summary Judgment**

On April 5, 2018, Plaintiff filed a complaint in this Court, alleging that Defendants violated a number of applicable rules and regulations in failing to stop the train.  (DE 1 ¶¶ 11-12.)  In Count I, Plaintiff seeks "Liability for Damage to Plaintiff's Property," and in Count II, Plaintiff seeks "Indemnity for Third Party Property Damage."  (DE 1 ¶¶ 15-22.)  Count II alleges, in part, that "[a]s a direct and proximate result of Defendants' negligence, third parties sustained significant damages, including but not limited to damages to the property of adjacent land owners, and damages to Plaintiff's customers in the form of lading and losses associated with delayed shipment of freight."  (DE 1 at 4-5.)

Defendants filed counterclaims against Plaintiff, alleging violations of the Federal Employers' Liability Act ("FELA") and the Locomotive Inspection Act ("LIA") for physical injuries suffered as a result of the collision.  (DE 22 at 5-10; DE 23 at 13-14.)  Defendants specifically allege that Train 175 failed to stop because the lead locomotive lacked PTC.  (DE 22 at 6; DE 23 at 9, 11.)  Accordingly, Defendants claim that Plaintiff and its employees were negligent in violation of FELA by: (1) failing to provide Defendants with a reasonably safe place to work; (2) failing to provide Defendants with reasonably conditions for work; (3) failing to provide Defendants with reasonably safe, necessary, and proper tools and equipment with which to perform their assigned duties; (4) failing to provide Defendants with reasonably safe methods for work; (5) failing to provide Defendant Tobergte with reasonably

safe supervision for work; (6) allowing and permitting dangerous and/or hazardous conditions to exist at the time and place where Defendants were injured; (7) failing to adopt, implement, enforce, and/or carry out reasonably safe customs, methods, procedures and practices for its employees at the time and place where Defendants were injured; (8) assigning Defendants work which Plaintiff knew, or in the exercise of reasonable care should have known, would result in injury to Defendants; (9) failing to provide Defendant Tobergte reasonably adequate training to operate a locomotive safely; (10) failing to furnish reasonably safe equipment to perform tasks assigned; (11) defectively assembling the train, handling the train, braking the train, placing the signals, and selecting the lead locomotive; (12) failing to provide Defendants with a place of employment free from recognized hazards likely to cause serious physical harm in violation of 29 U.S.C. § 654(a)(1); (13) violating statutory provisions in the Code of Federal Regulations; and (14) violating regulations promulgated by the Occupational Safety & Health Administration.  (DE 22 at 7-8; DE 23 at 13-14.)  Defendants further claim that Plaintiff violated the LIA by permitting the use of locomotives with conditions that endangered worker safety.  (DE 22 at 9; DE 23 at 14.)  Defendant Hall also brings a counterclaim for abuse of process.  (DE 23 at 14.)

On May 13, 2020, Plaintiff moved for partial summary judgment on Defendants' counterclaims.  (DE 78.)  Plaintiff argues that Defendants' PTC-related counterclaims and training- and supervision-related counterclaims under FELA are precluded.  (DE 78-1 at 2-3.)  Plaintiff further asserts that no evidence indicates that Plaintiff violated the LIA.  (DE 78-1 at 3.)  Plaintiff also contends that no evidence supports Defendants' counterclaims that a defective dispatch or signal system or the response of Train M74's crew caused the collision.  (DE 78-1 at 3.)

**H.      Plaintiff's Motion for Leave to File a First Amended Complaint**

Plaintiff also moves for leave to file a first amended complaint.  (DE 103.)  The Scheduling Order gave parties until March 12, 2019, to amend their pleadings.  (DE 28 at 1.) The Scheduling Order, as later amended, also set the discovery deadline as March 20, 2020, and the dispositive motion deadline as May 13, 2020.  (DE 67 at 1-2.)  The Scheduling Order instructed parties, "No extensions of the deadlines set in this order . . . shall be granted *unless an appropriate motion is filed prior to expiration of the deadline in question, and upon a showing of good cause beyond the control of counsel in the exercise of due diligence*."  (DE 28 at 3 (emphasis added).)

During the course of discovery, on July 19, 2019, Plaintiff responded to Defendant Hall's Interrogatory No. 19[1] with the following: "[Plaintiff] will waive any claim to collection of Third Party Settlements as part of their suit against defendants."  (DE 52-2 at 6, 10.)  On August 13, 2019, counsel for Defendant Hall requested that Plaintiff either respond in substance to Interrogatory No. 19 or amend the complaint to reflect the apparent waiver. (DE 52 at 4.)  Plaintiff's counsel responded on August 27, 2019, stating that "because [Plaintiff] has stated in its written response to Interrogatory No. 19 that it expressly waives any claim for the collection of such payments in connection with this action, [Plaintiff's] response to Interrogatory No. 19 is complete."  (DE 52 at 4.)  Plaintiff's counsel further stated that "[Plaintiff's] Complaint does not seek payments made to third parties in connection with the incident in suit and, therefore, there is no need for [Plaintiff] to amend its Complaint." (DE 52 at 4.)  Plaintiff did not amend its complaint.

---

[1] In Interrogatory No. 19, Defendant requested: "For each payment that the Plaintiff has made to a third party relating to property damage sustained in the collision, state the name and address of the person(s) issuing and approving such payment, payee, the form of the payment, the date of the payment, the amount of the payment and the specific property and damage giving rise to the payment." (DE 52-2 at 6.)

On September 27, 2019, parties deposed Christopher Shorts, who Plaintiff designated to testify about its property damages claim for destroyed property.  (*See* DE 105-1 at 6:2-6.) During the deposition, the following conversation occurred:

| | |
|---|---|
| Defendant Hall's Counsel: | Would you please turn to Interrogatory No. 19, which is the last interrogatory right before Request for Productions begins. |
| Shorts: | Okay . . . |
| Defendant Hall's Counsel: | And what was [Plaintiff's] answer? |
| Shorts: | This says, "[Plaintiff] will waive any claim to collection of Third Party Settlements as part of their suit against defendants." |
| Defendant Hall's Counsel: | So all of these numbers on the first page of Exhibit 2 . . . all these payments are payments that were [third]-party settlements, correct? |
| Shorts: | They are settlements with a third party.  That's correct. |
| Defendant Hall's Counsel: | Okay.  And just to speed things along, [Plaintiff's counsel], can you tell us whether -- If [Plaintiff] is waiving all of those payments, I'm going to skip on to the two -- |
| Plaintiff's Counsel: | No.  We -- |
| Defendant Hall's Counsel: | -- Southern -- |
| Plaintiff's Counsel: | I'm sorry. |
| Defendant Hall's Counsel: | -- cars. |
| Plaintiff's Counsel: | I apologize.  Didn't mean to interrupt.  No.  You should go through them. |

(DE 105-1 at 56:2-57:14.)

On October 4, 2019, Defendant Hall filed a motion for partial summary judgment under Federal Rule of Civil Procedure 56, arguing that "it is undisputed that [Plaintiff] has waived 'any claim' seeking the recovery of third-party payments that [Plaintiff] has made in

connection with the collision" against Defendant Hall.  (DE 52 at 1.)  Accordingly, Defendant Hall asserted that he was "entitled to judgment as matter of law on Count II of the Complaint pursuant to his affirmative defense of waiver."  (DE 52 at 1.)

After Defendant Hall filed his motion for partial summary judgment, Plaintiff amended its response to Interrogatory No. 19 on October 25, 2019:

> [Plaintiff] will waive any claim to collection of payments or settlements made to third party owners of *real property* whose land was allegedly damaged in connection with the collision in suit.  [Plaintiff] will likewise waive any claim to collection of payments or settlements made to [Plaintiff]'s customers in the form of *lading and losses* associated with delayed shipment of freight as a result of the collision in suit.
>
> Separate and apart from the above-described damages which have been or may be claimed by third parties, [Plaintiff] has paid certain settlements to third party owners of *rail equipment* damaged or destroyed in connection with the collision in suit.  The amounts paid for destroyed rail equipment, the identity of the third parties to whom those settlements were made, and the specific property and damage giving rise to those settlements, are set forth in Exhibit 2 to the September 27, 2019 deposition of Christopher Shorts[.]

(DE 60-4 at 2 (emphasis added).)  By April 20, 2018, Plaintiff had settled with all third-party owners of rail equipment damaged by the collision.  (DE 106-1 at 2; DE 107-1 at 2.)  Plaintiff issued settlement offers to all third-party owners but one on April 4, 2018, and issued a settlement offer to the remaining third-party owner on April 9, 2018.  (DE 106-1 at 2; DE 107-1 at 2.)  Seven of the eleven third-party owners accepted by April 5, 2018, the date on which Plaintiff filed this complaint.  (DE 1; DE 106-1 at 2; DE 107-1 at 2.)

On April 18, 2020, this Court ultimately denied Defendant Hall's motion for partial summary judgment, finding that "the record before the Court does not provide a sufficient basis for summary judgment and dismissal of a properly pleaded claim."  (DE 75 at 4.)  The Court continued that "[i]f Plaintiff wishes to amend [its] complaint . . . , it should do so by filing an appropriate motion in compliance with all applicable local and federal procedural

rules," citing the rule that "a [p]laintiff who wishes to drop some claims but not others should do so by amending his complaint[.]"  (DE 75 at 4.)

After the Court's decision, Plaintiff moved for leave to file a first amended complaint on May 1, 2020, to "clarify the nature of the damages sought in this action."  (DE 77 at 2.) Neither Defendant responded to the motion.  (DE 96 at 1.)  On June 29, 2020, the Court ordered Defendants to respond to the motion or show cause why they had not done so.  (DE 96 at 1-2.)  The Court also ordered Plaintiff to refile its motion, attaching the proposed amended complaint as an exhibit to the motion instead within the body of the motion.  (DE 96 at 1.)  Plaintiff refiled the motion on July 1, 2020 (DE 103), and Defendants have now responded (DE 108; DE 109).

Count II of the initial complaint originally stated:

> As a direct and proximate result of the Defendants' negligence, third parties sustained significant damages, including but not limited to damages to the property of adjacent land owners, and damages to Plaintiff's customers in the form of lading and losses associated with delayed shipment of freight.  [T]o the extent that Plaintiff has been or can be liable to the adjacent owners and its customers for the above described damages, and any such liability is merely vicarious, derivative, or constructive, Plaintiff is entitled to indemnity from the Defendants, jointly and severally, because Plaintiff is without fault for such damages.

(DE 1 at 4-5.)  In accordance with the proposed first amended complaint, Count II of the complaint would now read:

> As a direct and proximate result of the Defendants' negligence, [Plaintiff] has paid certain settlements to third party owners of rail equipment damaged or destroyed in connection with the subject collision.  [T]o the extent that Plaintiff has been or can be liable to third party owners of rail equipment for the above-described damages, and any such liability is merely vicarious, derivative, or constructive, Plaintiff is entitled to indemnity from the Defendants, jointly and severally, because Plaintiff is without fault for such damages.

(DE 103-1 at 5.)  The proposed first amended complaint also drops claims from Count I related to Plaintiff's removal of petroleum from the collision site.  (DE 1 at 4.)

## II.   Analysis

## A.   Plaintiff's Motion for Partial Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   The moving party bears the initial burden and must identify "those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citation and quotation marks omitted).   All evidence, facts, and inferences must be viewed in favor of the non-moving party. *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).   "In order to defeat a summary judgment motion, . . . [t]he nonmoving party must provide more than a scintilla of evidence," or, in other words, "sufficient evidence to permit a reasonable jury to find in that party's favor."   *Van Gorder v. Grand Trunk W. R.R., Inc.*, 509 F.3d 265, 268 (6th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

Here, the Court grants Plaintiff's motion for partial summary judgment in part and denies it in part.   The Court grants the motion for Plaintiff as to Defendants' (1) PTC-related FELA counterclaims, (2) training- and supervision-related FELA counterclaims, (3) dispatch and signal system-related FELA counterclaims, and (4) LIA counterclaims.   However, the Court denies the motion as to Defendants' FELA counterclaims related to the response of Train M74's crew.

## 1.   Preclusion of Federal Employers' Liability Act Counterclaims

Under the FELA, a railroad is liable for employee injuries "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."   45 U.S.C. § 51. Plaintiff argues that the Federal Railroad Safety Act ("FRSA"), the Signal Inspection Act

("SIA"), and the LIA all preclude Defendants' PTC-related FELA counterclaims.  (DE 78-1 at 22-26.)  Plaintiff further argues that the FRSA also precludes Defendants' training- and supervision-related FELA counterclaims.  (DE 78-1 at 27-30.)  The Court addresses each statute in turn.

### a.   Preclusion by the Federal Railroad Safety Act

The FRSA provides, "The Secretary of Transportation, as necessary, shall prescribe regulations and issue orders for every area of railroad safety[.]"   49 U.S.C. § 20103(a).  Accordingly, the FRSA contains an express preemption provision, which commands that "[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable."  49 U.S.C. § 20106(a)(1).  Specifically, "[a] State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement."  49 U.S.C. § 20106(a)(2).  An FRA regulation covers and thus, preempts a state-law negligence action when the regulation "substantially subsumes" the subject matter of the suit.  *Nickels v. Grand Trunk W. R.R., Inc.*, 560 F.3d 426, 429 (6th Cir. 2009) (citations and quotation marks omitted).  However, the FRSA contains no such provision precluding claims brought under federal law.  *See id.*

Nonetheless, Plaintiff asserts that, pursuant to the Sixth Circuit's decision in *Nickels v. Grand Trunk Western Railroad, Inc.*, 560 F.3d 426 (6th Cir. 2009), the FRSA precludes Defendants' PTC-related and training- and supervision-related FELA counterclaims.  (DE 78-1 at 15-16.)  In *Nickels*, the Sixth Circuit held that the FRSA precludes a plaintiff's FELA claim if the claim "would have been preempted if brought by a non-employee under state law."  560 F.3d at 430.  Therefore, the FRSA precludes a plaintiff's FELA claim if an FRA regulation covers the subject matter of the claim, and the railroad complied with the FRA regulation.  *Id.* at 429-30; *see Waymire v. Norfolk & W. Ry. Co.*, 218 F.3d 773, 775 (7th Cir.

2000) ("The question with which we are presented is whether a railroad company can be liable in a FELA negligence action claiming unsafe speed and inadequate warning devices when the complained of conduct complies with the conduct mandated by the FRSA and its regulations.  We hold that it cannot."); *Rice v. Cincinnati, New Orleans & Pac. Ry. Co.*, 955 F. Supp. 739, 741 (E.D. Ky. 1997) ("The FRSA therefore supersedes plaintiff's FELA action insofar as it asserts that the train was traveling at an unsafe speed, provided that the speed is in keeping with the FRSA regulation.").

However, Defendants argue that the Supreme Court's 2014 decision in *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014) has since abrogated the Sixth Circuit's holding in *Nickels*.  (DE 93 at 20-29; DE 98 at 13-20.)  There, the Supreme Court examined whether the Federal Food, Drug, and Cosmetic Act ("FDCA"), which prohibits the misbranding of food by false or misleading labeling, precluded a deceptive and misleading labeling claim brought under another federal statute, the Lanham Act.  *POM Wonderful*, 573 U.S. at 106.  Ultimately, the Court concluded that the FDCA did not preclude the Lanham Act claim.  *Id.*  In reaching this conclusion, the Court considered (1) the existence of an FDCA provision that expressly preempts state law claims but the lack of an FDCA provision that expressly precludes federal law claims; (2) despite the long-time co-existence of the FDCA and the Lanham Act, the lack of an FDCA provision that bars Lanham Act claims; (3) the complementary nature of the statutes; and (4) the difference between the potential disuniformity arising from the enforcement of varying *state* food and beverage labeling laws and the potential disuniformity arising from the enforcement of varying *federal* food and beverage labeling laws.  *Id.* at 109, 113-118.

According to Defendants, the reasoning from *POM Wonderful* compels this Court to find that the FRSA does not preclude FELA claims.  (DE 93 at 20-29; DE 98 at 13-20.)  First,

while the FRSA expressly preempts certain state laws, the statute does not similarly expressly preclude federal law claims.  (DE 93 at 25, 28; DE 98 at 16.)  Further, as Defendants point out, the FRSA contains no express limitation on, or mention of, FELA claims, despite the co-existence of the statutes for over fifty years.   (DE 93 at 25-26; DE 98 at 16, 18.) Defendants also contend that the FRSA and FELA are complementary; the FRSA's purpose is to "promote safety in every area of railroad operations and reduce railroad-related accidents and incidents," 49 U.S.C. §20101, while the FELA's purpose is "to provide liberal recovery for injured workers," *Kernan v. American Dredging Co.*, 355 U.S. 426, 432 (1958). (DE 93 at 25, 28; DE 98 at 17.)  Defendants also argue that, contrary to the purpose of the FELA, the preclusion of FELA claims by the FRSA would leave certain injured railroad employees that bring claims for negligent conduct without a remedy, insulating the negligent conduct of railroads.  (DE 93 at 25, 27-28; DE 98 at 17.)  Finally, Defendants assert that under *POM Wonderful*, uniformity arguments do not warrant the preclusion of federal law claims.  (DE 93 at 25; DE 98 at 17, 19.)

In raising these arguments, Defendants cite to a multitude of post-*POM Wonderful* cases[2] holding that, in light of *POM Wonderful*, the FRSA does not preclude FELA claims; notably, none of the cases are from the Sixth Circuit or the Eastern District of Kentucky.  No matter how persuasive the Court may find the reasoning in *POM Wonderful* as applied to this instant case, the Court is hesitant to overturn established and binding Sixth Circuit precedent, absent further guidance from the Sixth Circuit.  *See In re Higgins*, 159 B.R. 212, 216 (S.D. Ohio 1993) (in the context of overruling Sixth Circuit precedent, "a District Court

---

[2] *See, e.g.*, *Guinn v. Norfolk S. Ry. Co.*, 441 F.Supp.3d 1319, 1333-34 (N.D. Ga. 2020); *Barritt v. Union Pac. R.R. Co.*, CIVIL ACTION NO. 17-1044, 2018 WL 4343418, at *3 (W.D. La. Sept. 11, 2018); *Murray v. S.C. Cent. R.R. Co.*, Civil Action No.: 4:16-03841-AMQ, 2018 WL 3745016, at *5 (D.S.C. Aug. 7, 2018); *James v. Soo Line R.R.*, Civ. No. 16-2462 (MJD/HB), 2018 WL 279743, at *9 (D. Minn. Jan. 3, 2018); *Jones v. BNSF Ry. Co.*, 306 F.Supp.3d 1060, 1070 (C.D. Ill. 2017); *Meachen v. Iowa. Pac. Holdings*, 2016 WL 7826660, at *4 (D. Mass. Feb. 10, 2016); *Henderson v. Nat'l R.R. Passenger Corp.*, 87 F. Supp. 3d 610, 620-21 (S.D.N.Y. 2015); *Madden v. Antonov & AV Transp., Inc.*, 156 F. Supp. 3d 1011, 1020-22 (D. Neb. 2015).

should be extremely careful in concluding that circuit precedent is no longer good law, . . . and . . . must be powerfully convinced that the circuit will overrule itself at the next available opportunity") (citations and quotation marks omitted).  This is particularly the case here where *Nickels* involves different statutes than those at issue in *POM Wonderful*.  *See Cooper v. MRM Inv. Co.*, 367 F.3d 493, 507 (6th Cir. 2004) ("Implied overrulings, however, are disfavored.").  And, following the *POM Wonderful* decision, the Sixth Circuit still favorably cited to *Nickels*, albeit only in discussing the FRSA's preemption of state law actions.  *See CSX Transp., Inc. v. City of Sebree*, 924 F.3d 276, 285 (6th Cir. 2019).  Accordingly, the Court finds that *Nickels* still governs the relationship between the FRSA and the FELA—the FRSA precludes a FELA claim when an FRA regulation covers the subject matter of the claim, and the railroad has complied with that regulation.

Having concluded that *Nickels* remains good law in this Circuit and therefore, finding that the FRSA is capable of precluding FELA claims, the Court must now determine whether any FRA regulations cover Defendants' PTC-related and training- and supervision-related counterclaims under the FELA, and if so, whether Plaintiff has complied with those regulations.

1. **Positive Train Control-Related Counterclaims**

The Rail Safety Improvement Act of 2008 ("RSIA") requires certain railroad carriers to implement a positive train control system for operations conducted on specific railroad lines.  49 U.S.C. § 20157(a)(1).  The RSIA defines a positive train control ("PTC") system as "a system designed to prevent train-to-train collisions, over-speed derailments, incursions into established work zone limits, and the movement of a train through a switch left in the wrong position."  49 U.S.C. § 20157(i)(5).  The RSIA originally set the deadline for implementing a PTC system as December 31, 2015, *see* 49 U.S.C. § 20157(a)(1) (2008), but

later extended the deadline to December 31, 2018, *see* 49 U.S.C. § 20157(a)(1) (2015).  Despite

this deadline, the RSIA allows railroad carriers to abide by "an alternative schedule and

sequence for implementing a positive train control system," subject to the Secretary of

Transportation's review.  49 U.S.C. § 20157(a)(2)(B).  Even under an approved alternative

schedule and sequence, the railroad carrier must have implemented its PTC system by

December 31, 2020.  *Id.*  The FRA promulgated regulations effectuating the RSIA.  *See* 49

C.F.R.  236.1001.  The applicable FRA regulations reflect the relevant RSIA provisions,

requiring the railroads to implement the PTC system by December 31, 2018, or, at latest, by

December 31, 2020, upon obtaining the requisite approval.  49 C.F.R. § 236.1005(b)(7).

49 C.F.R. § 236.1006 further provides:

(a)  General.  *Except as provided in paragraph (b) of this section*, each
locomotive, locomotive consist, or train on any track segment equipped with a
PTC system shall be controlled by a locomotive equipped with an onboard PTC
apparatus that is fully operative and functioning in accordance with the
applicable [PTC Safety Plan] approved under this subpart.

(b)  Exceptions. (1) Each railroad required to install PTC shall include in its
[PTC Implementation Plan] specific goals for *progressive implementation* of
onboard systems and deployment of PTC-equipped locomotives such that the
safety benefits of PTC are achieved through *incremental growth* in the
percentage of controlling locomotives operating on PTC lines that are equipped
with operative PTC onboard equipment. . . . *The goals shall be expressed as the
percentage of trains operating on PTC-equipped lines that are equipped with
operative onboard PTC apparatus responsive to the wayside, expressed as an
annualized (calendar year) percentage for the railroad as a whole*. . . .

49 C.F.R. § 236.1006(a)-(b) (emphasis added).  Therefore, under § 236.1006, any train

operating on a track segment with a PTC system must have an operative PTC apparatus,

*unless the exception in paragraph (b) applies.  See id.*

Defendants claim that Plaintiff violated the FELA, in part, because its lead locomotive

was not equipped with a PTC apparatus.  (DE 22 at 6; DE 23 at 9-11.)  The subject matter of

Defendants' PTC-related counterclaims involves the implementation of a PTC system and

17

related PTC equipment within Plaintiff's railroad system.   Because § 236.1005 and § 236.1006 directly address the implementation of PTC systems and PTC equipment, these FRA regulations substantially subsume and cover the subject matter of Defendants' PTC-related FELA counterclaims.  *Nickels*, 560 F.3d at 429.

Parties do not dispute that the train collision occurred on March 18, 2018, over two years before the deadline to install the PTC-system under § 236.1005(b)(7).[3]  Consequently, at the time of the collision, Plaintiff was in compliance with 49 C.F.R. § 236.1005(b)(7).

Nonetheless, Defendants argue that Plaintiff violated § 236.1006 because the regulation required Plaintiff to operate Train 175 with PTC, yet Plaintiff failed to do so.  (DE 93 at 29-30; DE 98 at 22-23.)  However, Defendants are mistaken.  Even though Plaintiff had installed and activated a PTC system on the track segment where the collision occurred, § 236.1006 did not require Plaintiff to operate Train 175 with a PTC apparatus because the exception in paragraph (b) applied.  Wilson Decl. ¶ 10.

Consistent with the criteria in § 236.1006(b), Plaintiff's PTC Implementation Plan ("PTCIP") in effect at the time of the collision provided for the progressive implementation of Plaintiff's PTC system by December 31, 2020, and defined Plaintiff's implementation schedule.  Wilson Decl. ¶ 8.  The PTCIP also reported Plaintiff's progress in reaching annual implementation milestones, reflecting Plaintiff's incremental growth in equipping trains that operate on PTC lines with PTC apparatuses.  *Id.*  Indeed, the PTCIP fulfilled § 236.1006(b)'s obligation to express Plaintiff's goals for incremental growth as the percentage of trains operating on PTC lines with PTC apparatuses, requiring that only 10%-25% of the trains operating on PTC lines have PTC apparatuses at the time of the collision.  *Id.* ¶ 11; Wilson

---

[3] Plaintiff qualified for an extension for PTC implementation, and accordingly, had the full benefit of a December 31, 2020 deadline.  Wilson Decl. ¶ 4.  However, even under the stricter December 31, 2018 deadline, Plaintiff would have been in compliance with 49 C.F.R. § 236.1005(b)(7) at the time of the collision.

Decl., Ex. 1 at 18.  The FRA approved this plan.  Wilson Decl. ¶ 8.  Following the collision, Plaintiff submitted a revised PTCIP that noted that "not all trains operating over these districts or subdivisions . . . will necessarily be controlled by a locomotive with a fully operative and functioning PTC apparatus in accordance with an approved PTC Safety Plan, as otherwise required by 49 C.F.R. 236.1006(a), until the PTC system is fully implemented." Wilson Decl. ¶ 13; Wilson Decl., Ex. 4 at 675.  The FRA also approved this revised PTCIP, concluding that Plaintiff had installed all the necessary PTC system hardware for PTC system implementation under its PTCIP.  Wilson Decl. ¶ 14; Wilson Decl., Ex. 5 at 680-81. Therefore, at the time of the collision, Plaintiff was not required to operate Train 175 with a PTC apparatus and was in compliance with 49 C.F.R. § 236.1006.

Defendants have not submitted any evidence to the contrary; instead, Defendants simply cite to a statement from Defendant Tobergte's expert witness, Larry Mann, that Plaintiff violated 49 C.F.R. § 236.1006.  Mann Dep. at 105:8-11.  But for purposes of summary judgment, the Court "need not accept as true legal conclusions" such as Mann's statement. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).  Thus, there is no genuine dispute of material fact regarding whether Defendant complied with 49 C.F.R. § 236.1006.

Yet Defendants contend that the FRSA does not preclude their PTC-related FELA counterclaims because Plaintiff violated its own internal bulletins.  (DE 93 at 30-31; DE 98 at 23-24.)  But Defendants' argument fails as a matter of law.  Despite its preemption provision, the FRSA permits actions "alleging that a party has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by" the Secretary of Transportation.  49 U.S.C. § 20106(b)(1)(B).  However, Defendants fail to identify an FRA regulation or order mandating Plaintiff to publish these particular bulletins.  *See Mangiaracina v. BNSF Ry. Co.*, Case No. 16-CV-05270-JST, 2019 WL 1975461, at *10 (N.D. Cal. Mar. 7, 2019) ("It is insufficient to allege a violation of [the railroad's] own rules without

citing to any applicable federal regulation mandating these rules.") (citation and quotation marks omitted); *see also Tipton v. CSX Transp., Inc.*, No. 3:15-CV-311-TAV-CCS, 2017 WL 10398182, at *22 (E.D. Tenn. Oct. 25, 2017) ("The Court finds that, under the most natural reading of § 20106(b)(1)(B), a rule 'created pursuant to a regulation or order' is one affirmatively mandated by a specific federal regulation."); *Johns v. CSX Transp., Inc.*, 210 F. Supp. 3d 1357, 1374 (M.D. Ga. 2016) ("Plaintiff does not point to any federal regulation or order that required Defendant to create the [internal instructions] on which it relies."). This is insufficient to overcome the preclusion of Defendants' PTC-related FELA counterclaims.

Because FRA regulations cover Defendants PTC-related FELA counterclaims, and Plaintiff complied with those regulations, the FRSA precludes Defendants' PTC-related FELA counterclaims. Accordingly, the Court grants Plaintiff's motion for partial summary judgment as to Defendants' PTC-related FELA counterclaims.[4]

## 2.    Training- and Supervision-Related Counterclaims

The FRA promulgated regulations at 49 C.F.R. Part 240 to "ensure that only qualified persons operate a locomotive or train." *See* 49 C.F.R. § 240.1(a). "This part prescribes minimum Federal safety standards for the eligibility, training, testing, certification and monitoring of all locomotive engineers" but "does not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part." *See* 49 C.F.R. § 240.1(b). As part of these minimum federal safety standards, a railroad must maintain an approved written program for certifying the qualifications of its locomotive engineers. 49 C.F.R. § 240.101(a). In such a written program, a railroad may elect to accept responsibility for training student engineers and initially certifying them. 49 C.F.R. §

---

[4] Because the Court finds that the FRSA precludes Defendants' PTC-related FELA counterclaims, the Court need not address whether the Signal Inspection Act or the Locomotive Inspection Act also precludes Defendants' PTC-related FELA counterclaims.

240.103(d).  To test and evaluate whether locomotive engineers are qualified for certification, railroads designate a Designated Supervisor of Locomotive Engineers to make that determination.  *See* 49 C.F.R. §§ 240.105, 240.127, 240.7.  These regulations otherwise govern the written program's criteria for certification and implementation of the certification process, including criteria for testing knowledge, examining skill performance, monitoring performance, and initial and continuing education.  49 C.F.R. §§ 240.1-240.411.

In training employees, a railroad must also have a written program to "periodically instruct [employees] on the meaning and application of the railroad's operating rules."  49 C.F.R. § 217.11(a).  The railroad must retain records of the tests and inspections it performs of its compliance with its operating rules and make these records available to the FRA.  49 C.F.R. § 217.9(d)(1).  Eligible railroads must also "file each new amendment to its code of operating rules, each new timetable, and each new timetable special instruction with the [FRA] within 30 days after it is issued."  49 C.F.R. § 217.7(b).

Defendants claim Plaintiff failed to provide Defendant Tobergte with reasonably adequate training and reasonably safe supervision in violation of the FELA.  (DE 22 at 6-7; DE 23 at 13.)  Accordingly, the subject matter of Defendants' counterclaims relate to the training and supervision of Train 175's locomotive engineer.  The FRA regulations listed under 49 C.F.R. §§ 240.1-240.411, as well as 49 C.F.R. §§ 217.9-217.11, specifically dictate the training and supervision of a railroad's locomotive engineers.  Therefore, these FRA regulations substantially subsume and cover Defendants' training- and supervision-related FELA counterclaims.  *See Lombardy v. Norfolk S. Ry. Co.*, No. 1:12-CV-210, 2014 WL 2468612, at *8 (N.D. Ind. June 3, 2014) ("Plaintiff's claims for negligent training, education, instruction, supervision, and qualification are precluded by the FRSA.").

Per § 240.101(a), Plaintiff maintained an FRA-approved written program for certifying its locomotive engineers.  Noakes Decl. ¶ 3.  Plaintiff designated Noakes as a

Designated Supervisor of Locomotive Engineers to evaluate trainees, including Defendant Tobergte, pursuant to Plaintiff's certification program and §§ 240.105, 240.127, and 240.7. *Id.* ¶¶ 7, 10.  In accordance with the program and the corresponding FRA regulations, Noakes determined that Defendant Tobergte met all of the qualifications for certification as a locomotive engineer, and Defendant Tobergte was thus certified.  *Id.* ¶¶ 11, 15.  Thereafter, Noakes continued to evaluate Defendant Tobergte, conforming with Plaintiff's FRA-approved certification program.  *Id.* ¶15.

As § 217.11(a) prescribes, Plaintiff also had a written program for instructing employees on the meaning and application of the operating rules.  *Id.*  at ¶ 5.  Indeed, Noakes supervised Defendant Tobergte's instruction and testing on Plaintiff's operating rules and conducted in-person evaluations of Defendant Tobergte's performance in operating trains. *Id.* ¶ 8.  Consistent with § 217.9(d)(1), Plaintiff also retained annual summaries of its operational tests and inspections of engineer trainees, and made these copies available to the FRA for review.  *Id.* ¶¶ 5, 9.  Plaintiff filed its operating rules with the FRA, fulfilling § 217.7(b).  *Id.* ¶ 5.

Defendants do not dispute that Plaintiff complied with the applicable FRA regulations.  Instead, Defendant Tobergte contends that "the issue here is not whether Plaintiff complied with Federal Regulations concerning the training of Engineer Tobergte, but whether he was actually competent and qualified to be a locomotive engineer."  (DE 98 at 24.)  To support this contention, Defendants cite to Defendant Tobergte's affidavit where he states that two trainers told him that they did not think he was making sufficient progress to be promoted to a locomotive engineer.  (DE 90-1, Tobergte Aff. ¶ 8.)

Defendant Tobergte's statement is flawed.  For purposes of the preclusion analysis, the key issue *is* whether Plaintiff complied with FRA regulations.  *See Waymire*, 218 F.3d at

775.  The evidence demonstrates that Plaintiff complied with the FRA regulations implicated by Defendants' training- and supervision-related FELA counterclaims, and Defendants have not provided any conflicting evidence.  Further, Defendant Tobergte's statement that his trainers told him that he was not making sufficient progress for certification are inadmissible hearsay, which the Court may not consider in a motion for summary judgment.  *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) ("[E]vidence submitted in opposition to a motion for summary judgment must be admissible.  Hearsay evidence . . . must be disregarded.") (citation and quotation marks omitted).  Thus, no genuine dispute exists as to whether Plaintiff complied with the relevant FRA regulations.

Accordingly, the FRSA precludes Defendant's training- and supervision-related FELA counterclaims because 49 C.F.R. §§ 240.1-240.411 and 49 C.F.R. §§ 217.9-217.11 cover the counterclaims, and Plaintiff has complied with those regulations.  The Court therefore grants Plaintiff's motion for partial summary judgment as to Defendants' training- and supervision-related FELA counterclaims.

**b.    Insufficient Evidence to Support Failure of Dispatch and Signal Systems**

Plaintiff also argues that the evidence does not support Defendants' arguments that failures in Plaintiff's dispatch and signal systems caused the collision.  (DE 78-1 at 30-36.) According to Plaintiff, no evidence exists to imply that its dispatch or signal system failed. (DE 78-1 at 30-36.)

Parties do not dispute that the dispatch and signal systems did not generate a pop-up alert or alarm sound when Train 175 violated the Akers "STOP" signal.  *See* Haines Decl. ¶ 23; Wenger Dep. at 35:2-20, 36:10-14.   Despite Defendants' claims to the contrary, Defendants provide no evidence to support that these systems failed.  The evidence instead shows that while the dispatch system generally produces alerts upon the violation of a "STOP" signal, the system will not do so if two trains enter the same block of track from

opposite directions. Haines Decl. ¶ 11. Such was the case here. *Id.* ¶¶ 12-15. Therefore, the dispatch system did not fail, but rather, operated as designed. Defendants submit no evidence refuting this. Indeed, statements from Plaintiff's Assistant Superintendent of Dispatch and its Assistant Division Manager for Communications and Signals suggest that both the dispatch and signal systems were properly working before the collision. Gold Decl. ¶¶ 1-2, 12; Haines Decl. ¶ 26. The dispatcher on duty was also unaware of any system malfunctions. Wenger Dep. at 72:6-12. Defendants do not point to any additional evidence demonstrating that these systems did not function as expected. Thus, Defendants have not presented evidence to support that the dispatch and signal systems failed and caused the collision. The Court accordingly grants Plaintiff's motion for partial summary judgment as to Defendants' FELA counterclaims related to failures in Plaintiff's dispatch and signal systems.

**c.      Insufficient Evident to Support Counterclaims Relating to Train M74's Crew**

Plaintiff also asserts that any argument that Train M74's crew caused the collision lacks evidentiary support and that Defendant has not submitted any evidence otherwise. (DE 78-1 at 36-37.) Defendants contend that Train M74's crew did not "stop as soon as possible" or before the train passed the stop signal.[5] (DE 93 at 34.) Evidence shows that Train M74's crew applied the brakes twenty-four seconds before impact but placed the train in "emergency" twelve seconds before impact. Lloyd Dep. at 89:5-20. The Court agrees that, for the purposes of summary judgment, a jury could reasonably find that Train M74's crew caused the collision, in part, by waiting until twenty-four seconds before impact to activate the brakes and waiting until twelve seconds before impact to place the train in emergency.

---

[5] To the extent that Defendants rely upon statements that are inadmissible hearsay in arguing that Train M74's crew caused the collision, the Court has not considered that evidence in deciding this portion of the motion.

Thus, Plaintiff's motion for partial summary judgment is denied as to Defendants' FELA counterclaims regarding the response of Train M74's crew.

### d.    Insufficient Evidence to Establish LIA Violations

Defendants claim that Plaintiff violated the LIA by using a locomotive that could not withstand every test that the federal regulations prescribe.  (DE 23 at 14.)  Specifically, Defendants assert that Plaintiff violated 49 C.F.R. § 229.45 because Plaintiff permitted the use of locomotives on its lines that were not "free of conditions that endangered the safety of the crew."  (DE 22 at 12.)  Defendants allege that Plaintiff failed to equip the Train 175 with PTC and that Train 175's second locomotive, Unit 4063, was not in proper condition because it had ongoing brake problems that existed for a month and a half before the collision.  (DE 22 at 6; DE 23 at 9-11; DE 93 at 33.)  Plaintiff argues that the failure to equip Train 175's lead locomotive with PTC cannot constitute a violation under the LIA and that Defendants have not set forth any other evidence that Plaintiff violated the LIA.  (DE 78-1 at 27.)

Under the LIA, a railroad carrier may use a locomotive on its railroad line only when the locomotive and its parts and appurtenances "(1) are in proper condition and safe to operate without unnecessary danger of personal injury; (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and (3) can withstand every test prescribed by the Secretary under this chapter."  49 U.S.C. § 20701.  Therefore, a railroad carrier violates the LIA "either by breaching the broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary danger of personal injury, or by failing to comply with the regulations issued by the [FRA] and promulgated under the LIA."  *Edwards v. CSX Transp., Inc.*, 574 F. App'x 614, 617 (6th Cir. 2014).  To state a claim under the LIA: "a plaintiff must demonstrate: (1) the locomotive was "**in use**" during the time of the injury; (2) the locomotive [was] located on the defendant's railroad track at the time of the injury; and (3) the condition

of the locomotive created an unnecessary risk of injury." *Coleman v. Norfolk S. Ry. Co.*, 304 F. Supp. 3d 648, 653 (E.D. Ky. 2018).

The Court agrees with Plaintiff that, under these circumstances, Plaintiff's failure to equip Train 175's lead locomotive with PTC cannot constitute a violation under the LIA. A railroad carrier is not liable under the LIA for failure to install equipment "unless the equipment is required by federal regulation, or is considered to be an integral or essential part of a locomotive." *Reed v. Norfolk S. Ry. Co.*, 312 F. Supp. 2d 924, 927 (N.D. Ohio 2004). As discussed *supra*, 49 C.F.R. § 236.1006 did not require Plaintiff to operate Train 175 with PTC equipment at the time of the collision, and therefore, PTC equipment was not required by federal regulation. Further, the PTC equipment was not considered an integral or essential part of the locomotive because it is not a "mechanical component essential to the operation of a locomotive." *McGinn v. Burlington N. R.R. Co.*, 102 F.3d 295, 299 (7th Cir. 1996). Thus, Plaintiff could not have violated the LIA by failing to install the PTC equipment.

Under 49 C.F.R. § 232.109(b), "all inoperative dynamic brakes shall be repaired within 30 calendar days of becoming inoperative or at the locomotive's next periodic inspection[,] whichever occurs first." 49 C.F.R. § 232.109(b). Because Unit 4063's dynamic brake problems had only resurfaced a few days before the collision, Plaintiff did not violate § 232.109(b) by failing to repair those issues within 30 days, and Defendants do not submit evidence indicating otherwise. Further, Defendants have not provided any additional evidence suggesting that Plaintiff failed to comply with any other FRA regulations by operating Unit 4063 with dynamic brake issues or that doing so created an "unnecessary danger of personal injury." *Edwards*, 574 F. App'x at 617. Since Defendants have not presented "more than a scintilla of evidence" to support their claim that Plaintiff violated the LIA by operating Unit 4063 despite its dynamic brake problems, Defendants have not presented enough evidence to

overcome summary judgment. *Van Gorder*, 509 F.3d at 268.  Accordingly, the Court grants Plaintiff's motion for partial summary judgment as to Defendants' LIA counterclaims.

## B.  Plaintiff's Motion for Leave to File a First Amended Complaint

"When a motion to amend is filed before the time prescribed by the scheduling order, Rule 15(a) is the primary focus," but "[w]hen the motion to amend is filed after the scheduling order's deadline, . . . a demonstration of good cause under Rule 16(b) is required before a court may consider if an amendment is proper under Rule 15(a)." *Birchwood Conservancy v. Webb*, 302 F.R.D. 422, 424 (E.D. Ky. 2014).  Pursuant to Rule 16(b), a "district judge . . . must issue a scheduling order after receiving the parties' report under Rule 26(f)." Fed. R. Civ. P. 16(b)(1)(A).  "The scheduling order must limit the time to . . . amend the pleadings[.]" Fed. R. Civ. P. 16(b)(3)(A).  But the scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  Plaintiffs demonstrate good cause if they show that "despite their diligence[,] they could not meet the original deadline." *Leary v. Daeschner*, 349 F.3d 888, 907 (6th Cir. 2003).  In determining whether to modify the scheduling order, courts must also consider whether the amendment would prejudice the defendant. *Id.* at 906.

Plaintiff moves for leave to file a first amended complaint because the amendments "would serve the interests of justice by clarifying the relief sought by [Plaintiff] in connection with this action." (DE 103 at 3.)  According to Plaintiff, during the deposition of Christopher Shorts on September 27, 2019, "[i]t became apparent . . . that there was a misunderstanding surrounding the nature of the claims [Plaintiff] intended to waive[.]"  (DE 110 at 3-4; DE 111 at 3-4.)  Thus, Plaintiff contends that it was not aware of the misunderstanding until this deposition.  (DE 110 at 8; DE 111 at 8.)  Plaintiff argues that the opportunity to clarify the claims in this action constitutes "good cause" to grant the motion.  (DE 110 at 9; DE 111 at 9.)  Plaintiff also maintain that granting the motion would not prejudice Defendants because

the proposed first amended complaint does not contain any additional claims not already present in Plaintiff's initial complaint; that complaint included a "general claim for indemnity for payments made to third parties." (DE 110 at 10-11; DE 111 at 10-11.)  Further, Plaintiff asserts that Shorts' deposition put Defendants on notice that Plaintiff did not intend to waive claims for payments made to third-party owners of rail equipment, giving them "ample time to conduct additional discovery." (DE 110 at 11; DE 111 at 11.)

Defendants seemingly do not object to granting the motion to the extent that Plaintiff seeks to omit its claims for removing petroleum from the crash site under Count I and its indemnity claims for payments made to third-party landowners and customers under Count II.[6]  (DE 106 at 2.)  Instead, Defendants primarily object to Plaintiff's additional indemnity claim for payments to third-party rail equipment owners.  (DE 106 at 2; DE 107 at 6.)  Defendants argue that Plaintiff cannot meet the "good cause" standard under Federal Rule of Civil Procedure 16 because it did not act with "reasonable diligence"—Plaintiff was "aware of the third-party equipment damage claims when it filed suit." (DE 106 at 2, 7; DE 107 at 6.)  Further, Defendants maintain that allowing Plaintiff to amend the complaint to add this claim after all the Scheduling Order deadlines have passed would unduly prejudice them. (DE 106 at 2; DE 107 at 7.)  According to Defendants, this is particularly the case here where "Plaintiff repeatedly misled them by stating that it waived any claim for third-party payments." (DE 106 at 9; DE 107 at 7.)

Because the Scheduling Order's March 12, 2019 deadline to amend pleadings had already passed when Plaintiff initially filed its motion for leave to amend its complaint on May 1, 2020, Plaintiff must demonstrate good cause under Rule 16(b).  This conforms with

---

[6] Only Defendant Hall explicitly states that he does not object to allowing Plaintiff to drop these claims.  (DE 106 at 2.)  However, in his response, Defendant Tobergte does not raise any arguments opposing the removal of these claims.

this Court's requirement that it will not grant any extensions under the Scheduling Order unless the party shows "good cause beyond the control of counsel in the exercise of due diligence." (DE 28 at 3.)

However, here, Plaintiff cannot demonstrate good cause to amend its complaint to add the indemnity claim for payments to third-party owners of damaged rail equipment because it cannot show that, despite its diligence, it could not have met the deadline to amend its complaint.  Indeed, Plaintiff's actions instead demonstrate an utter lack of diligence in its failure to comply with the relevant deadlines under the Scheduling Order.  Plaintiff did not file its initial motion for leave until May 1, 2020, over a year past the March 12, 2019 deadline for amending the pleadings.  Yet Plaintiff had ample opportunity to file the complaint, as it was aware of the potential settlement payments it would make to these third parties before it even filed the complaint.  Plaintiff issued almost all of its settlement offers to third parties before it filed the complaint, and many of the third parties had already accepted the offers at the time of filing.  (DE 106-1 at 2; DE 107-1 at 2.)  All other third parties accepted the offers by April 20, 2018, just two weeks after Plaintiff filed the initial complaint.  (DE 106-1 at 2; DE 107-1 at 2.)  Plaintiff never attempted to file an amended complaint before the deadline to amend pleadings nor attempted to request an extension—even when prompted by Defendant Hall's counsel on August 13, 2019, to amend the complaint after receiving Plaintiff's response to Interrogatory No. 19 that indicated Plaintiff waived its claims to third-party settlement payments.  (DE 52 at 4.)  Plaintiff cannot point to anything that prevented it from filing a motion for leave before May 1, 2020.  Accepting, for argument's sake, that Plaintiff did not become aware of any "misunderstanding" regarding the claims it intended to waive until the Shorts deposition on September 27, 2019, Plaintiff still waited to file its initial motion for leave for seven more months.  This continuous delay does not comport with the good cause standard.

Further, the amendment to include the indemnity claim for payments made to third-party owners of damaged rail equipment would prejudice Defendants.  First, contrary to Plaintiff's argument, its initial complaint did not include a "general claim for indemnity for payments made to third parties" in Count II.  (DE 110 at 11; DE 111 at 11.)  In raising this argument, Plaintiff focuses on the language in the initial complaint that "[a]s a direct and proximate result of the Defendants' negligence, third parties sustained significant damages, **including but not limited to** damages to the property of adjacent land owners, and damages to Plaintiff's customers in the form of lading and losses associated with delayed shipment of freight."  (DE 1 at 4-5 (emphasis added).)  But the next line reads, "To the extent that Plaintiff has been or can be liable to the adjacent owners and its customers for the above described damages, and any such liability is merely vicarious, derivative, or constructive, Plaintiff is entitled to indemnity from Defendants[.]"  (DE 1 at 4-5.)  The "including but not limited to" language speaks to damages generally, while Plaintiff only specifically sought indemnity for liability for damages paid to adjacent landowners and customers in the initial complaint.  The amended complaint replaces that indemnity claim with another seeking indemnity for third-party owners of damaged rail equipment.  Therefore, the amended complaint raises an entirely new indemnity claim.

The timing of Plaintiff's motion for leave especially demonstrates the potential prejudice to Defendants if the Court allows Plaintiff to raise this new indemnity claim.  The motion comes over a year after the Scheduling Order deadline to file amended pleadings.  (DE 28 at 1.)  Plaintiff filed the motion one and a half months beyond the March 20, 2020 discovery deadline and mere weeks before the May 13, 2020 dispositive motion deadline.  *Siegner v. Twp. of Salem*, 654 F. App'x 223, 228 (6th Cir. 2016) (finding prejudice where the plaintiff moved to amend the complaint one month after the dispositive motion deadline and two months after discovery closed); *Shane v. Bunzl Distrib. USA, Inc.*, 275 F. App'x 535, 537 (6th

30

Cir. 2008) (prejudice where amendment would require further discovery in the case); *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999) (prejudice where the discovery and dispositive deadlines had passed, and a motion for summary judgment had been filed). Plaintiff refiled the motion on July 1, 2020, a month and half after the dispositive motion deadline.[7] (DE 103; DE 67 at 1.)  "[A]t some point both the parties and the pleadings will be fixed." Fed. R. Civ. P. 16 advisory committee's notes to 1983 amendment.

Next, Defendants justifiably relied upon Plaintiff's statements that Plaintiff waived all claims for payments due to third parties.  In its response to Interrogatory No. 19, Plaintiff explicitly stated that it "will waive any claim to collection of Third Party Settlements as part of their suit against defendants."  (DE 52-2 at 6.)  Plaintiff further reiterated in correspondence with Defendant Hall's counsel on August 27, 2019, that its response to Interrogatory No. 19 was "complete" because it "expressly waives any claim for the collection of such payments in connection with this action[.]"  (DE 52 at 4.)  Plaintiff's counsel also stated that because "[Plaintiff's] Complaint does not seek payments made to third parties in connection with the incident in suit," "there is no need for [Plaintiff] to amend its Complaint." (DE 52 at 4.)  Thus, Defendants could have reasonably interpreted Plaintiff's position as waiving any and all claims for payments made to third parties, including those owners of damaged rail equipment.  Accordingly, Defendants had insufficient notice of the new indemnity claim to properly conduct any related discovery by the deadline.

The colloquy at Shorts' deposition was not enough to put Defendants on notice that Plaintiff did not intend to waive its indemnity claim for payments to third-party owners of

---

[7] Even affording Plaintiff the benefit of the filing date of its initial motion for leave to file a first amended complaint, its motion comes too late.  That motion was filed on May 1, 2020, but according to Local Rule 7.1(c), the motion would not have been fully briefed until June 5, 2020, a few weeks after the dispositive motion deadline on May 13, 2020.

damaged rail equipment.  There, the following conversation occurred between Defendant Hall's counsel and Plaintiff's counsel:

| | |
|---|---|
| Defendant Hall's Counsel: | Okay.  And just to speed things along, [Plaintiff's counsel], can you tell us whether -- If [Plaintiff] is waiving all of those payments, I'm going to skip on to the two -- |
| Plaintiff's Counsel: | No.  We -- |
| Defendant Hall's Counsel: | -- Southern -- |
| Plaintiff's Counsel: | I'm sorry. |
| Defendant Hall's Counsel: | -- cars. |
| Plaintiff's Counsel: | I apologize.  Didn't mean to interrupt.  No.  You should go through them. |

(DE 105-1 at 57:4-57:14.)  While Plaintiff's counsel arguably responds "[n]o" to whether Plaintiff is waiving *all* third-party settlement payments, that interaction does not clearly show that Plaintiff was *not* waiving an indemnity claim for settlements paid to third-party owners of damaged rail equipment.  The transcript does not include any other clarification from counsel, and Plaintiff still did not endeavor to amend its complaint for seven more months.  Indeed, Plaintiff did not supplement its response to Interrogatory No. 19 until October 25, 2019, nearly one month after Shorts' deposition and after Defendant Hall had filed his motion for partial summary judgment on the waiver issue.  (DE 60-4 at 2.)  And even in its supplemental response, Plaintiff did not clearly state that it intended to seek indemnity for the settlements paid to third-party owners of rail equipment.  Plaintiff merely responded that "[s]eparate and apart from the above-described damages which have been or may be claimed by third parties, [Plaintiff] has paid certain settlements to third party owners of rail equipment damaged or destroyed in connection with the collision in suit."  (DE 60-4 at 2.)

Because Plaintiff cannot make the requisite "good cause" showing for its failure to amend its complaint by the Scheduling Order deadline and because allowing Plaintiff to

amend the complaint to include a new indemnity claim after the discovery deadline would prejudice Defendants, the Court denies Plaintiff's motion for leave to file a first amended complaint to the extent that the proposed amended complaint seeks to add a new indemnity claim for settlements paid to third-party owners of damaged rail equipment.  However, the Court will grant the motion to the extent that the proposed amended complaint drops claims for the removal of petroleum from the collision site under Count I and indemnity claims for third-party adjacent landowners and customers under Count II.  While the Court expresses doubt that Plaintiff has demonstrated good cause for its failure to meet the amendment deadline to remove these claims for the same reasons provided above, the Court finds good cause exists to conform the complaint with Plaintiff's consistent representations that it waived these claims.  Further, Defendants do not oppose these amendments, and the amendments do not pose potential prejudice to Defendants since the amendments would narrow the claims against them.  Therefore, the Court grants in part and denies in part Plaintiff's motion for leave to file a first amended complaint.

### III.   Conclusion

The Court hereby ORDERS as follows:

1. Plaintiff Norfolk Southern Railway Company's motion for partial summary judgment (DE 78) is GRANTED IN PART and DENIED IN PART.  The Court GRANTS the motion as to Defendants' PTC-related FELA counterclaims, training- and supervision-related FELA counterclaims, dispatch and signal system-related FELA counterclaims, and LIA counterclaims.  Those counterclaims are DISMISSED from this action.  However, the Court DENIES the motion as to Defendants' FELA counterclaims related to the response of Train M74's crew;

2.    Plaintiff's motion for leave to file a first amended complaint (DE 103) is GRANTED IN PART and DENIED IN PART.  The Court GRANTS the motion to the extent that the proposed first amended complaint omits claims for the removal of petroleum from the collision site under Count I and indemnity claims for third-party adjacent landowners and customers under Count II.  However, the Court DENIES the motion to the extent that the proposed first amended complaint adds a new indemnity claim for settlements paid to third-party owners of damaged rail equipment; and

3.    Plaintiff SHALL file a first amended complaint in conformance with this order and opinion.

Dated February 04, 2021

KAREN K. CALDWELL
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF KENTUCKY